1  JESSICA PRIDE CA Bar No. 249212
**THE PRIDE LAW FIRM**
2  2534 State Street, Suite 411
San Diego, California  92101
3  Telephone: 619-516-8166
Facsimile: 619-422-1341
4
LAURIE HIGGINBOTHAM, *pro hac vice pending*
5  Texas State Bar Number:  50511759
TOM JACOB, *pro hac vice pending*
6  Texas State Bar Number: 24069981
Whitehurst, Harkness, Brees, Cheng, Alsaffar, &
7  Higginbotham, PLLC
7500 Rialto Blvd., Bldg. Two, Ste. 250
8  Austin, Texas 78735
Telephone: 512-476-4346
9  Facsimile: 512-476-4400

10
Attorneys for Plaintiff
11  MADISON-RAE JORDAN

12

13                     UNITED STATES DISTRICT COURT

14                   SOUTHERN DISTRICT OF CALIFORNIA

15

| | |
|---|---|
| MADISON-RAE JORDAN, individually and as next friend of D.M., a minor, | Civil No.: **'15CV1199 BEN NLS** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. MEDICAL MALPRACTICE UNDER THE FEDERAL TORT CLAIMS ACT** |
| UNITED STATES OF AMERICA, | |
| Defendants. | |

**I.**

**PRELIMINARY STATEMENT**

1.    Plaintiffs Madison-Rae Jordan, individually and as next friend of D.M., a minor, bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States of America and would respectfully show the following:

1

2

## II.

3

## PARTIES

4

2.      This is a medical malpractice case.

5

3.      Plaintiffs Madison-Rae Jordan and minor D.M. reside in Oceanside,

6

California, within the jurisdiction of this Court. D.M. is the natural and biological

7

child of Plaintiff Madison-Rae Jordan. D.M. was born on August 13, 2009, and was

8

3 years old in May 2013.

9

4.      The Defendant is the United States of America, its officers, agents,

10

employees, and representatives.

11

## III.

12

## JURISDICTION, SERVICE, AND VENUE

13

5.      This Federal District Court has jurisdiction because this action is

14

brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–80,

15

commonly known as the Federal Tort Claims Act, which vests exclusive subject-

16

matter jurisdiction of the Federal Tort Claims Act in Federal District Court.

17

6.      The United States of America may be served with process in

18

accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy

19

of the Summons and Complaint on the United States Attorney Laura E. Duffy,

20

Acting United States Attorney for the Southern District of California by certified

21

mail, return receipt requested at her office:

22

U.S. Attorney's Office Southern District of California

23

Federal Office Building

24

Attn: Civil Process Clerk

25

880 Front Street, Room 6293

26

San Diego, California 92101-8893

27

7.      Service is also affected by serving a copy of the Summons and

28

THE PRIDE
LAW FIRM

2

No _____

Complaint on Loretta E. Lynch, Attorney General of the United States, by certified

mail, return receipt requested at:

> The Attorney General's Office
>
> ATTN: Civil Process Clerk
>
> U.S. Department of Justice
>
> 950 Pennsylvania Avenue, NW
>
> Washington, DC 20530-0001

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)

because the United States is a Defendant, the Plaintiffs reside in this district and

have their domicile in this district, and no real property is involved in the action.

Venue is also proper in this district because a substantial part of the events or

omissions giving rise to the claim occurred within this judicial district.

### IV.

### LIABILITY OF THE UNITED STATES

9.      This case is commenced and prosecuted against the United States of

America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort

Claims Act. Liability of the United States is predicated specifically on 28 U.S.C.

§ 2674 because the personal injuries and resulting damages of which the complaint

is made were proximately caused by the negligence, wrongful acts, and/or

omissions of employees and/or agents of the United States of America working at

Naval Hospital Camp Pendleton in Oceanside, California, and/or the Naval Medical

Center in San Diego, California, while acting within the scope of their office,

employment, and/or agency under circumstances where the United States of

America, if a private person, would be liable to the Plaintiffs in the same manner

and to the same extent as a private individual.

10.      The substantive law of the State of California applies to this lawsuit.

11.      The Department of the Navy is an agency of the United States of

THE PRIDE
LAW FIRM

3

No _____

America.

12.     The Defendant United States of America, through its Department of the Navy, at all material times owned, operated, and controlled Naval Hospital Camp Pendleton in Oceanside, California and staffed its facilities with its agents, servants, and employees. Defendant, also through its agency, at all material times owned, operated, and controlled the Naval Medical Center in San Diego, California and staffed its facilities with its agents, servants, and employees.

13.     At all material times all persons involved in the medical and health care services provided to Plaintiff D.M. at Naval Hospital Camp Pendleton in Oceanside, California and the Navel Medical Center in San Diego, California were agents, servants, and/or employees of the Department of the Navy, the United States of America, or some agency thereof, and were at all material times acting within the course and scope of such employment, including Dr. Marie Strohl-Stranger née Strohl, Lt. Dana Lilli, Dr. Mia Jin, Dr. Paul Moullett, and Dr. Esther Guard and Nurse Adelaine Trask.

14.     In May 2013, D.M. was a patient of the Naval Hospital Camp Pendleton in Oceanside California, and the Navel Medical Center in San Diego, California.

## V.

## JURISDICTIONAL PREREQUISITES

15.     Pursuant to 28 U.S.C. §§ 2672 and 2675(a) the claims set forth meet all jurisdictional prerequisites, including timely administrative presentment. The claims set forth in this complaint were delivered to the Department of the Navy on July 16, 2013. Receipt of the claims was acknowledged by the Department of the Navy on July 17, 2013. This claim was finally denied in writing on April 29, 2015 and this complaint is filed less than six (6) months since the date of denial. Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and

THE PRIDE
LAW FIRM

4

No _____

1   conditions prior to the commencement and prosecution of this suit.

2       16.     Madison-Rae Jordan as Guardian and Next Friend of D.M. filed a

3   Standard Form 95 that stated a "sum certain" of twenty million dollars

4   ($20,000,000.00). Madison-Rae Jordan also filed a Standard Form 95 individually

5   that stated a "sum certain" of twenty million dollars ($20,000,000.00).

6                                   **VI.**

7                                 **FACTS**

8       17.     This is a Federal Tort Claim Action for monetary damages sustained

9   by Plaintiff arising out of the personal injuries to D.M., a minor, as a result of

10  substandard—and therefore negligent—medical and hospital care, including but not

11  limited to negligent performance lumbar procedure resulting in cauda equina

12  syndrome and other injuries to D.M.'s lower spinal nerves, and the failure to

13  diagnose the subsequent hematoma compressing D.M.'s spinal nerves.

14      **18.**    Before May 2013, D.M. was able to walk without gait issues as

15  appropriate for his age, was not incontinent of the bowel and bladder, and did not

16  suffer from constant pain. Before 2013, he had no lower extremity weakness, or

17  progressive bowel or bladder incontinence.

18      19.     On or about May 3, 2013, D.M. was treated at Naval Hospital Camp

19  Pendleton for flu-like symptoms. He was diagnosed with sinusitis and started on

20  amoxicillin.

21      20.     On or about May 4, 2013, at approximately 11:30, D.M. presented to

22  the Naval Hospital Camp Pendleton ER due to continued flu-like symptoms,

23  headache, and fever. His vital signs were documented: He had a pulse of 129,

24  respiratory rate of 24, temperature of 101.2, and oxygen saturation of 98%. By

25  12:20, temperature had decreased to 99.8.

26      21.     D.M.'s condition was stable with "no acute distress" documented at

27  12:30.

28

THE PRIDE
LAW FIRM

5                    No _____

22.     Naval Hospital Camp Pendleton ER physician Dr. Strohl decided to perform a lumbar puncture to test D.M. for meningitis. This procedure was performed before obtaining D.M.'s blood work, a blood culture, or starting an IV.

23.     On or about May 4, 2013, at approximately 14:08, resident physician Dr. Lilli, MD, LT performed the lumbar puncture on D.M. During the procedure D.M. was not sedated or restrained. No local anesthesia was administered per the Invasive Procedure Addendum. D.M. struggled and screamed throughout the procedure. Dr. Lilli documented the procedure as "traumatic tap noted on single needle stick" with "bloody" fluid obtained. The lab report describes the puncture as "grossly bloody," with RBC count 171 and no organisms noted.

24.     Dr. Lilli's record of the lumbar puncture indicates that the procedure was a single tap performed at the L4 level. The subsequent operative record states, "Of note, multiple punctures of the ventral dura at the L2 spinal level were directly visualized."

25.     Following the lumbar puncture, D.M. began vomiting, experienced increased headache pain, and complained of back pain and weakness in his legs. In recovery, when D.M. attempted to walk towards his mother, he was only able to take a few steps before falling to his knees.  Cessation of ambulation occurred within 12 hours of the lumbar puncture. When D.M. would take steps, his gait was described in the medical records as "buckling." Back pain, lower extremity weakness, and gait difficulties can result from spinal cord compression.

26.     The STAT lab work drawn at 14:35 returned with normal values for the complete blood count and differential, including seg/bands and WBC 9.5 (5-17.5). Had ER physician Dr. Strol waited until these lab results had been obtained, she would have known that D.M.'s complete blood count was normal and that a lumbar puncture was unnecessary. A prudent physician would not have put a child at risk by performing this invasive procedure before obtaining the patient's lab

results, and further, would not have performed the lumbar puncture on an unsedated 3-year-old child without proper restraints or sedation.

27.    On or about May 4, 2013, at approximately 17:00, Dr. Paul Moullet performed a History & Physical Exam on D.M. The note stated, "Mother denies nausea/vomiting (except after Pt. had LP in ER). States child was acting normally prior to LP in ED. Discussion: Pt. vitals reassuring. No significant physical exam findings to suggest acutely septic picture. PE limited by uncooperative child due to s/p LP. Child headache much worse and now with nausea/vomiting. LP in ED non-diagnostic due to traumatic tap. CBC reassuring. UA suggests mild dehydration." D.M. was diagnosed with a fever of unknown origin and mild dehydration and was admitted for overnight observation.

28.    A note by Dr. Jin Mia at 17:47 on May 4, 2013, stated, "I was present with Dr. Moullet and we performed a history and physical together. . . . In ER an LP was performed, which was grossly bloody (child was unable to be sedated due to recent PO intake). A CSF culture was sent, gram stain without any organisms seen. On exam, patient lying down and complaining of back pain. I suspect there may be a migrainous component to [D.M.'s] headache. Discussed that WBC count appears reassuring, no organisms in CSF. Mother does note that [D.M.] has vomited but this was after the LP was performed; prior to the procedure, there was no prolonged course of vomiting."

29.    On or about Sunday May 5, 2013, U.S. Government medical providers negligently postponed further diagnostic testing until the following day, Monday May 6, 2013, despite D.M.'s progressively-worsening condition as evidenced by his severe headache and inability to bear weight while walking. A prudent physician would have recognized the potential link between D.M.'s new symptoms and the traumatic, "bloody" lumbar puncture performed the day before. Given the risk of spinal cord compression, further diagnostic testing should have been

performed immediately to mitigate D.M.'s risk of suffering permanent spinal cord damage.

30.    On or about May 6, 2013, at approximately 11:11, a CT scan of the head was performed on D.M., with normal results. At approximately 11:14 a CT scan of the lumbar spine was performed, which revealed, "Spina bifida occulta defects are demonstrated at L5, S1, S2, and S3. Impression: Spina bifida occulta defects involving the lower lumbar and sacral spine as described."

31.    A note written by Nurse Adelaine Trask further described the significant decline in D.M.'s condition following the lumbar puncture procedure:

32.    "CSF significant for traumatic tap with elevated protein. Reassuring CRP and UA. He had 4 episodes of vomiting after the lumbar puncture. He developed lower extremity weakness, requiring assistance with ambulation to the restroom. He shows UOP just above 1ml/kg/hr. Has had decreased appetite since admission. Stat head CT and L-spine significant for spina bifida occulta from L5-S3. Blood culture, urine culture and CSF culture are negative for 48hrs. Acute bilateral extremity weakness may be from pain due to traumatic tap, pt's stubbornness in walking or developing guillan barre syndrome. Discussed case with Dr. Serena, Peds Neurology, who recommended transfer."

33.    On or about May 6, 2013, after the CT scans were performed, D.M. was transferred to the Naval Medical Center San Diego ("NMCSD"). An MRI of his brain and spinal cord performed at NMSCD revealed: "Within the thecal sac there are numerous areas of abnormal signal; Subarachnoid hemorrhage (SAH) which extends from levels L1 through L3 with dimensions (5.8x1.0x1.1cm) for dominant moderate to large subarachnoid hemorrhage/hematoma with smaller subdural components present which extend from vertebral body levels T10 through L5. This collection exerts mass effect upon the cauda equina nerve roots with minimal deviation of the conus medullaris. The nerve root appears splayed against

THE PRIDE
LAW FIRM

8

No _____

the periphery of the thecal sac." After the MRI was performed, D.M. was emergently taken to the operating room for laminoplasty and urgent evacuation of the subarachnoid hemorrhage.

34.     On or about May 16, 2013, D.M. was discharged home. The narrative summary note stated:

35.     "On Saturday, 5/4, his fever became unresponsive to medication, highest temp was 102.5 and mum took him to the Camp Pendleton ED. An LP was done in the ED (non-sedated, traumatic) as well as a lumbar CT showing spina bifida occulta, but no infectious etiology and a normal head CT. Mum reports that [D.M.] started throwing up after the LP and continued to do so for about 24 hours after. He was admitted. The following day (HD#2) he refused walking and complained of pain in his legs when standing supported. His mum describes it as buckling his legs when he walks. Of note, he also complained to mum yesterday that his bottom hurt, to the point that he did not want to sit down. On HD#3 (today 5/6) he was still unable to walk with continued headaches. He was transferred to NMCSD for closer monitoring of his neurological status… 5/7/13 went for MRI of CNS where he was found to have a hematoma of the lower spine that was compressing lower spinal nerve tracts. The neurosurgeon took the Pt. to the OR emergently. In the OR, Pt. had a laminectomy from L2-5, was noted to have multiple punctures through the dura at the L2 level with a large hematoma surrounding the cauda equina. This was evacuated and dural patches were applied. By the time of discharge, he was taking a few steps with minor hip stabilizing assistance from nursing or parents. Received a suprapubic catheter 5/13 due to failing spontaneous void trial."

36.     D.M. suffered injuries from compression of his spinal cord and had to undergo an emergency laminectomy due to the negligence of U.S. Government providers. U.S. Government health care providers were negligent in multiple ways.

First, they performed an unnecessary lumbar puncture without waiting to obtain D.M.'s blood work. Second, they failed to properly sedate and restrain or provide anesthesia to D.M. during the lumbar puncture. Further, the resident inaccurately documented and negligently performed the lumbar puncture. Sticking D.M. multiple times, with him writhing about, was negligent. Additionally, providers were negligent due to the delay in diagnosing and treating the subarachnoid hemorrhage D.M. developed after the lumbar puncture. D.M. began vomiting, his headache worsened, he began complaining of significant back pain, he complained that his bottom hurt, and he lost strength in his legs. Despite these new symptoms, healthcare providers at Naval Hospital Camp Pendleton waited nearly 2 days (May 4, 2013 to May 6, 2013) to transfer D.M.

37.   The negligent medical treatment provided by U.S. Government providers proximately caused D.M.'s injuries and current condition. Currently, D.M. is suffering from pain, has difficulty walking and running, and has problems with bowel and bladder incontinence. He is regularly taken out of school for frequent doctor visits, incontinence incidents, and because of the constant pain he endures. Due to the nerve roots effected, D.M. will likely have lifelong sexual dysfunction problems. He will require continued treatment from pain management doctors and urologists throughout his life. Due to the trauma involved in his treatment, D.M. has developed major phobias regarding medical treatment, including anger issues and tantrums. D.M. is currently and will likely remain dependent on others for his activities of daily living and mobility, and he will probably require some form of attendant care throughout his life.

**VII.**

**CAUSE OF ACTION**

38.   The Defendant, the United States of America, was negligent in one or more of the following respects:

THE PRIDE
LAW FIRM

10

No _____

1. In failing to timely and properly treat D.M.;

2. In failing to timely and properly care for D.M.;

3. In failing to timely and properly diagnose D.M.;

4. In failing to timely and properly evaluate D.M.;

5. In failing to timely and properly monitor D.M.;

6. In failing to timely and properly assess D.M.'s medical needs;

7. In failing to timely, properly and accurately maintain D.M.'s medical records;

8. In negligently performing an unnecessary invasive procedure on D.M. on May 4, 2013;

9. In failing to perform a lumbar puncture on D.M. without sedation;

10. In failing to appropriately position D.M. during the lumbar puncture;

11. In negligently performing the lumbar puncture procedure on D.M.;

12. In failing to timely and properly perform an MRI on D.M.; and

13. In failing to timely and properly diagnose and treat D.M.'s subarachnoid hemorrhage and subsequent cauda equina syndrome that developed after the lumbar puncture.

39. At all material times, the employees, agents, or representatives of the United States of America were negligent and caused the injuries sustained by the Plaintiffs.

## VIII.

## DAMAGES

40. As a proximate result of the Defendant's negligent acts or omissions, Plaintiffs suffered injuries, which would not have otherwise occurred. Plaintiff D.M. pleads for all damages available under California state law, federal law, and equity including, but not limited to:

1. Past and future physical pain and suffering;

2.     Past and future mental anguish;

3.     Past and future suffering, humiliation and emotional distress;

4.     Past and future physical impairment and disability;

5.     Past and future physical disfigurement;

6.     Past and future loss of income and impairment of earning capacity;

7.     Past and future medical, health, and attendant care expenses;

8.     Loss of enjoyment of life; and

9.     Other pecuniary damages.

41.     As a proximate result of the Defendant's negligent acts or omissions, D.M.'s mother, Plaintiff Madison-Rae Jordan individually suffered injuries, which would not have otherwise occurred. She pleads for all damages available under California state law, federal law and equity, including, but not limited to:

1.     Past and future suffering and mental anguish;

2.     Past and future medical, health care, and attendant care expenses for D.M. until his age of majority; and

3.     Other pecuniary damages.

## IX.

## CONCLUSION

42.     Plaintiffs request that Defendant be cited to appear and answer herein: that upon final trial and hearing, the Plaintiffs have a judgment against the Defendant, for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law and in equity, both general and special, to which the Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

THE PRIDE
LAW FIRM

No _____

Dated:  May 29, 2015                    THE PRIDE LAW FIRM


By:____/s/ Jessica Pride, Esq._____
Jessica Pride
Attorneys for Plaintiff
Email: jpride@pridelawfirm.com

Laurie Higginbotham, *pro hac vice pending*
Texas State Bar Number:  50511759
lhigginbotham@nationaltriallaw.com

Tom Jacob, *pro hac vice pending*
Texas State Bar Number: 24069981
tjacob@nationaltriallaw.com

THE PRIDE
LAW FIRM

13                              No _____